THOMAS W. B. MURRAY

*v.*

DANIEL H. TOLMAN.

*Filed at Ottawa March 28, 1896—Rehearing denied October 9, 1896.*

1. FRAUD—*when false representations by a seller as to value will avoid sale.* Representations by the president of a bank to a customer that stock in a corporation of which he was the promoter and principal stockholder was worth a sum in excess of its par value, would yield certain dividends and prove a profitable investment, made while he knew that it was the intention to do business not authorized by the charter and to so manage it that he and the bank would acquire all the assets, are not within the rule that a purchaser can not avoid his contract because of false statements of the seller as to the value of the thing sold.

2. SAME—*when representations as to value will bind a vendor.* Representations made by a vendor as to the value of the thing sold to a vendee who is wholly ignorant of such value and who relies upon such representations, which were given as facts and not as a mere opinion, are binding upon such vendor.

*Tolman* v. *Murray,* 54 Ill. App. 420, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

WEIGLEY, BULKLEY & GRAY, for appellant.

MOSES, PAM & KENNEDY, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Thomas W. B. Murray filed his bill in equity in the circuit court of Cook county, against Daniel H. Tolman, the Midland Company, the Chicago Trust and Savings Bank, and others, for the rescission of a certain contract of purchase of ten shares of the capital stock of said Midland Company, alleged to have been obtained by Tolman from Murray by fraud, and for an accounting of payments therefor, and of certain payments of usurious interest on two certain judgment notes, of $1000 each,

given by said Murray, and held, as alleged, by the defendants or some of them, and for the cancellation and delivering up of said notes, and for an injunction to prevent the assignment of said notes or the entry of judgment thereon. On the report by the master of the evidence and of his conclusions, Murray amended his bill and the defendants filed amendments to their answers. The issues as made were found in favor of Murray, the master finding that the allegations of the bill were in substance fully sustained, and the court decreed accordingly. This decree was reversed in the Appellate Court for the First District and the bill ordered dismissed. From that judgment Murray has taken this appeal.

The record is voluminous, and we cannot undertake to set out here anything more than the bare substance of the case as we find it to be.

It appears that Tolman was the president and principal stockholder of the Chicago Trust and Savings Bank, which, for convenience, is called the bank. Murray was a manufacturer of tents, awnings, etc., and had occasion to borrow money on short time, and had borrowed money from the bank through Tolman. Afterward, and before such borrowed money was repaid, Tolman called upon Murray at his place of business and represented to him that he was getting up a company to accommodate such men as he, who needed money on short time; that the company was on the mutual principle of building and loan associations, and organized to guarantee the payment of moneys which should be borrowed by its members. Murray had never before heard of the Midland Company, and knew nothing of its object, its organization or of the value of its stock, except what he was told by Tolman. The conversations on the subject sought and had by Tolman with Murray were three or four in number, and extended over a period of about three weeks, in April, 1888. He represented to Murray that members of the company could borrow money on its guaranty at six

per cent, and while they would pay to the company one per cent per month for its guaranty, the dividends they would receive as stockholders would amount to twenty-five per cent, and proceeded to demonstrate to Murray how the plan would work out the results as stated by him. Murray testified that Tolman figured it out to his satisfaction at the time, but that he could not himself reproduce or explain it. Murray replied to Tolman that he did not need to borrow money in that way, but that he could get all the money he wanted at his bank. Tolman assured him, however, that it was a profitable investment anyway; that there were other men in it whose names he knew who did not need to borrow money; that it would pay twenty-five per cent on the money invested, and so figured it out to him; represented that the stock was then worth $150 for each share of $100; that Murray could sell it for that if he got tired of his bargain, and that he would himself buy it back at that figure. The promise to repurchase was repeated more than once. Without any other information of the company, its charter powers or the value of its stock than that given to him by Tolman, and relying upon its correctness and the truth of Tolman's statements and promises, Murray signed a paper produced by Tolman, reading as follows: "The Midland Company having been established with a capital stock of $100,000, divided into one thousand shares, we, the undersigned, hereby subscribe for and agree to purchase of D. H. Tolman the number of shares of stock of said company set opposite our respective names, paying therefor $150, and to take delivery at the Chicago Trust and Savings Bank May 5, 1888." This paper was eventually signed by upwards of one hundred persons. The articles of incorporation were not, nor was any writing purporting to show the purpose of the incorporation or its charter powers, produced or shown to Murray, but he relied entirely upon the truth of the statements and representations of Tolman without making any independent inquiry

or investigation. Some time afterward Murray applied to Tolman to redeem his promise and to repurchase the stock, but was told by Tolman that he had all of the Midland stock he wanted then, but that Murray should come again in the spring. In the spring he refused to buy, and afterward, about two and one-half years after obtaining the stock, Murray tendered it back to Tolman and demanded the return of the purchase money, but was refused. Soon thereafter this bill was filed.

Prior to signing the paper above mentioned by Murray, Tolman had caused an application to be made to the Secretary of State for articles of incorporation of said company, showing that its object was to guarantee commercial paper and to deal therein, but the application had been refused by the secretary, with the information that articles of incorporation would not be issued on such a statement. He then caused another application to be made for a charter, containing the statement that the object for which the corporation was formed was to secure information and furnish statements concerning the responsibility of persons and corporations, to conduct a merchandise commission business and to contract in respect thereto, so that Tolman knew that his representations to Murray as to the object, purposes and charter powers of the Midland Company were false. He had special information and knowledge also on that subject which he concealed from Murray. The application for incorporation was made at the instance of Tolman, by employees in his bank. The company was paid for its stock by a check on the bank of $50,000 by Tolman for the stock subscribed for by him, and by his checks given to four others who, at his instance, had subscribed for the other $50,000 and which checks they turned over to the company, and the whole $100,000 was placed to the credit of the company on the books of the bank. Tolman parceled out the stock to those who, like Murray, had agreed to purchase from him at an advance of fifty per cent, and

in this way realized a profit of $50,000 almost as soon as the company was organized, and by subsequent purchases and sales before its final collapse an additional amount of more than double this amount. It does not appear that he was possessed of the same confidence in the eventual success and dividend-paying power of the company that he was able to inspire in others, for when the final collapse came he did not own any of the stock, —at least not any considerable amount of it. Of this $100,000 placed to the credit of the company it seems that $62,500 was invested in the purchase of $50,000 of the capital stock of the bank, although such stock was paid up only to the extent of sixty per cent of its face value, and the other $37,500 was consumed in taking up and paying to the bank the paper of its members which it had guaranteed and which they had failed to pay.

As soon as the company had been organized, it proceeded, under the direction and management of Tolman, to engage in a business for which it was not incorporated, viz., the guaranteeing of the commercial paper of its members, and although it charged and received one per cent per month for such guarantees the promised dividends were not forthcoming, but Tolman and the bank soon became possessed of substantially all that was valuable of its capital. Borrowers were charged usurious rates of interest,—often as high as two and one-half per cent per month; and it is apparent from the evidence, that, aside from the merely speculative purposes of Tolman in dealing in and manipulating the shares of stock, the purpose of the corporation was to afford a cover and blind for the charging and collection of usurious rates of interest, and to insure the safe collection of loans by having an indorser under the same management as the bank, which would be financially responsible as long as its capital, supplied by the borrowers, should hold out. It is also clear that Tolman knew, when he represented to Murray that the stock was worth $150 per share and

would earn twenty-five per cent in dividends yearly, that such representations were false. Not only so, but he must have known that the stock could not long remain at its face value, but that under the management which he then had in contemplation, substantially the entire capital of the company would eventually pass to himself or to the bank, of which he was the principal stockholder, and that the whole purchase money would be lost to Murray. Not only so, but he knew at the time that Murray was ignorant of these facts and of his contemplated fraud, and relied upon his statements and representations, and reposed confidence in him as the president of the bank at which he had borrowed money and as the promoter and principal stockholder in the Midland Company, and as one trusted by many others whom he knew; and the evidence warrants the conclusion, that in order to dispel any doubts which Murray might have, and to prevent any independent inquiry or investigation, and with the fraudulent intent of breaking his promise and of swindling Murray, he promised Murray he would repurchase the stock at the same price whenever he, Murray, should tire of his bargain. In this view we think the promise proper to be considered. Cooley on Torts, 487.

We are disposed to agree with the views expressed by Mr. Justice WATERMAN in his dissenting opinion in the Appellate Court, that Tolman was in a position to know what the value of the stock was, and necessarily had knowledge of its value which no other person could obtain except with his consent and assistance, and that, in view of all the circumstances, Murray did as men of ordinary business experience would likely do under such circumstances if they decided to take the stock,—that is, decided to take it relying upon the statements and representations of Tolman,—and that cases of this character fall within well recognized exceptions to the general rule that the vendee is not authorized to rely upon the statements of the vendor as to the value of the subject matter

of the contract as representations upon which he may avoid the contract if shown to be false, but that "where the vendee is wholly ignorant of the value of the property, and the vendor knows this, and also knows that the vendee is relying upon his (the vendor's) representation as to value, and such representation is not a mere expression of opinion but is made as a statement of fact, which statement the vendor knows to be untrue, such a statement is a representation by which the vendor is bound." Pomeroy's Eq. Jur. secs. 878, 879; *Pickard* v. *McCormick*, 11 Mich. 68.

Much that was said by Judge CAMPBELL in delivering the opinion of the court in the *Pickard case* might well be said of the case at bar. "It is undoubtedly true," he said, "that value is usually a mere matter of opinion, and that the purchaser must expect that a vendor will seek to enhance his wares and must disregard his statements of their value. But while this is generally the case, yet we are aware of no rule which determines, arbitrarily, that any class of fraudulent misrepresentations can be exempted from the consequences attached to others. Where a purchaser without negligence has been induced, by the arts of a cheating seller, to rely upon material statements which are knowingly false, and is thereby damnified, it can make no difference in what respect he has been deceived if the deceit was material and relied on. It is only because statements of value can rarely be supposed to have induced a purchase without negligence, that the authorities have laid down the principle that they can not usually avoid a bargain." * * * In the case before us the alleged fraud consisted of false statements by a jeweler to an unskilled purchaser of the value of articles which none but an expert could be reasonably supposed to understand. The dealer knew of the purchaser's ignorance, and deliberately and designedly availed himself of it to defraud him. We think that it cannot be laid down as a matter of law that value is never a material

fact, and we think the circumstances of this case illustrate the impropriety of any such rule. They show a plain and aggravated case of cheating, and it would be a deserved reproach to the law if it exempted any specific fraud from a remedial action where a fact is stated and relied upon, whatever may be the general difficulty of defrauding by means of it." See, also, *Kost* v. *Bender*, 25 Mich. 515. *Allen* v. *Hart*, 72 Ill. 104, is to the same effect. See *Holdom* v. *Ayer*, 110 Ill. 448.

With a fraudulent intent Tolman represented that the company was organized on the principle of building and loan associations. Murray doubtless had some general knowledge of such corporations, and knew that they were recognized as lawful incorporations and understood to be profitable in many cases. Nor can it be said from this record that Murray was induced to enter into the contract through his mistake or ignorance of the law, or by the misrepresentations of Tolman as to matters of law merely. Some of the false representations of Tolman certainly did pertain to questions of law, but they were accompanied by false representations of material facts, and from the respective positions of the parties and the attendant circumstances were calculated to deceive, particularly when his statements of fact were demonstrated by an arithmetical calculation which Tolman must have known, but Murray did not know, to be false and deceptive.

In *Williams* v. *Rhodes*, 81 Ill. 571, it was said (p. 586): "It has been held by this court, in general terms, that a court of equity will not relieve on account of ignorance of the law where the facts are known. (*Goltra* v. *Sanasack*, 53 Ill. 456; *Wood* v. *Price*, 46 id. 439.) To this there may be exceptions, which we should recognize in cases of imposition, undue influence, misplaced confidence, surprise, etc." (See, also, *Gordere* v. *Downing*, 18 Ill. 492.) But, as we have seen, in the case at bar the facts were unknown to Murray and known to Tolman, and were falsely rep-

resented to Murray by Tolman, and to our minds the case presents, in all its phases, a very clear exception to the general rule.   See 2 Pomeroy's Eq. Jur. sec. 847; Kerr on Fraud, 90; *Broadwell* v. *Broadwell*, 1 Gilm. 599; *Townsend* v. *Cowles*, 31 Ala. 428; *Moreland* v. *Atchison*, 19 Tex. 303.

The organization of the company was itself a fraudulent device, gotten up by Tolman for an unlawful purpose, and to enrich himself, by fraudulent means, at the expense of the unwary.   It is, however, among other things insisted that Murray has been guilty of *laches*, and for that reason is not entitled to relief.   We cannot so find from the record.   There has been no unreasonable delay, after ascertainment of the facts, in filing the bill. It does not appear that the rights of any third party will be prejudiced, nor is it perceived how Tolman is injured by the delay.

There was an accounting of usurious interest paid by Murray to Tolman on his note of $1000, which the master was, we think, justified in finding was given in renewal of previous notes signed by Murray and one Long, and it was found that there was a balance due Tolman on this note, after deducting such usurious interest, of $723.91, which was ordered to be deducted from the principal and interest thereon paid by Murray for said ten shares of stock, and the decree directed the surrender of the note and the payment by Tolman to Murray of the balance. It is objected that the decree does not direct the re-assignment and delivery of the shares of the stock to Tolman.   The decree is not as specific, perhaps, as it should have been in this respect, but we think a fair construction of it makes it incumbent on Murray to do this, and that he cannot have the decree enforced otherwise.

Objection is also made to the equitable jurisdiction of the court; but in view of the allegations of the bill and the evidence we think it a case for cognizance in a court of equity.

Other minor questions are raised. One is in respect to the decree as to the surrender by the Midland Company of a note of Murray on the payment of a certain amount provided in the decree, but as that company did not appeal we do not see how that matter concerns the other defendant.

On the whole, we think the case was properly decided in the trial court. The judgment of the Appellate Court will therefore be reversed and the decree of the circuit court will be affirmed.

*Judgment reversed.*