**Al VAUGHN, Marjorie Vaughn, Algon Corporation and Springfield Drive-Ins, Inc., Plaintiffs-Appellees,**

v.

**GENERAL FOODS CORPORATION and Burger Chef Systems, Inc., Defendants-Appellants.**

**No. 85–1847.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1986.

Decided July 29, 1986.

Rehearing and Rehearing En Banc Denied Sept. 9, 1986.

Daniel A. Medrea, Lucas, Holcomb & Medrea, Merrillville, Ind., Michael D. Hausfeld, Kohn, Milstein, Cohen & Hausfeld, Washington, D.C., for defendants-appellants.

John J. Kirby, Jr., Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for plaintiffs-appellees.

Before WOOD, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In 1982, plaintiffs Al Vaughn, Marjorie Vaughn, Algon Corporation, and Springfield Drive-Ins, Inc. (Vaughns) instituted this diversity action against General Foods Corporation and Burger Chef Systems, Inc. (the Company) claiming that they had been fraudulently induced to invest in Burger Chef franchises. The Vaughns claimed that Burger Chef engaged in a ten-year plan to dispose of its business (the System) while representing to its franchisees that it planned to build the System into a "fast food contender." Following a jury trial on a claim of fraudulent misrepresentation,[1] a verdict was entered for the plaintiffs. The defendants filed a motion for a judgment notwithstanding the verdict (JNOV) pursuant to Fed.R.Civ.P. 50(b) or, in the alternative, for a new trial pursuant to Fed.R. Civ.P. 59. The district judge denied the motion. For the reasons detailed below, we reverse the judgment of the district court.

### I

The Vaughns' relationship with Burger Chef began in 1963 when they opened their first Burger Chef fast food restaurant in the St. Louis, Missouri area. By 1967, the Vaughns owned and operated five Burger Chef restaurants and, in 1970, they acquired a sixth. In 1968, General Foods entered the hamburger fast food market by

---

1. The jury was instructed on two different theories of fraud presented in Count III of the Vaughns' amended complaint. R.101. The first was based on Indiana common law, and the second was based on section 706 of the Illinois Franchise Disclosure Act, Ill.Ann.Stat. ch. 121½, ¶ 706 (Smith-Hurd 1960 & Supp.1985). *See infra* note 5 for discussion of the statutory claim.

acquiring the Burger Chef chain as a wholly-owned subsidiary for $16 million and the assumption of substantial preexisting liabilities. The business did not, however, proceed according to General Foods' expectations. Accordingly, in 1971, General Foods, as a result of significant losses, wrote down $80 million of its investment in Burger Chef. This write down was widely publicized and was well known to Burger Chef's franchisees. As a result of the write down, some 460 franchised and company-owned stores were closed, and General Foods considered selling its Burger Chef operation which consisted of the 908 remaining restaurants. However, no buyer could be found. Therefore, instead of selling the Burger Chef operation at that time, General Foods decided to "manage the loss" and shifted its focus to developing its "heartland" market in the Midwest. As part of its new strategy, General Foods discontinued its former practice of guaranteeing leases for franchisees and diminished the amounts of capital it infused into the System. The new strategy did not, however, yield the return that the Company had anticipated. Continuing financial difficulties caused the Company to begin voluntarily to waive and abate franchise fees.

In December 1975, General Foods commissioned the consulting firm of Booz-Allen & Hamilton to analyze the Company's marketing strategy. As a result of that firm's recommendations, another new plan was developed. Among the facets of that strategy were recruitment of new management experienced in the hamburger fast food industry and minimization of the risks of the franchise operation. In order to implement this new approach, General Foods hired Terrance Collins, an expert in the hamburger fast food industry, from McDonald's to serve as president and chief operating officer of Burger Chef. In August 1978, the Company's financial department devised a study on the salability of the Burger Chef System. This study, codenamed "Project Beethoven," indicated that Burger Chef was now ranked fourth in the hamburger fast food market and that it still held second place in its "heartland" markets.

In late 1980, General Foods contracted with Goldman Sachs, an investment banking firm, to review its options with respect to Burger Chef. Goldman Sachs advised General Foods that the value of the System was unlikely to deteriorate and that they should reconsider selling the System after 1981. Goldman Sachs' reasoning was that, if the new strategy worked and the business turned around, its profitability would make it more salable. This reasoning would appear to have been sound. In 1981, Burger Chef finally showed a profit and, in summer 1981, General Foods received an unsolicited inquiry concerning the purchase of the System. Several months of negotiations resulted in the December 1981 agreement to sell Burger Chef to Hardee's, a competing chain. By the time that the System was sold to Hardee's for $43.5 million, General Foods had infused between $45 and $70 million in capital into the System in addition to the purchase price.

Shortly after the sale was consummated, the Vaughns instituted suit in the district court alleging that the defendants had violated the antitrust laws, had breached their fiduciary duties to the Vaughns, and had fraudulently misrepresented their intentions with respect to the Burger Chef System. On June 30, 1983, the Vaughns filed a first amended complaint, which contained claims only for breach of contract, breach of fiduciary duty, fraud and punitive damages. The breach of contract and breach of fiduciary duty claims were dismissed at the close of the plaintiffs' case.

At trial, the Vaughns attempted to prove that various statements made by General Foods and certain omissions, coupled with assertions contained in brochures and trade publications, created a false impression in the minds of the Vaughns and other franchisees that the System was viable and that it was supported fully by General Foods. According to the Vaughns, these statements and omissions constitute actionable fraud. Specifically, the Vaughns point to statements made in certain written doc-

uments. At trial, Mr. Vaughn testified that, in or around 1970, he became aware of these undated publications which reflected the Company's intent to expand its franchise operation. Tr. 827. One such document, an undated brochure designed to woo prospective franchisees to open a Burger Chef restaurant, stated:

**WHY BURGER CHEF?**

A Burger Chef Restaurant franchise gives you the opportunity to be an independent business person while still being a part of a proven system. As a franchisee, you'll enjoy the full support and backing of one of the largest hamburger fast-food chains in the nation. Our plans call for aggressive but controlled growth, and a big part of our plan includes bringing new franchisees into the system.

\* \* \* \* \* \*

As a wholly owned subsidiary of General Foods Corporation, Burger Chef Systems, Inc. has the financial stability which this multi-billion dollar, international food corporation brings to it.

Yet Burger Chef remains an independent, autonomous corporate entity which is managed and directed by seasoned executives with many years of experience in the fast-food industry.

Plaintiffs' Ex. 762 at 5. The brochure also stated that the franchisor would provide the franchisee with a wide variety of support services:

**GETTING YOU STARTED**

Once your franchise application is approved, Burger Chef Systems will implement a systemized program to help you get your restaurant open and operating with the greatest possible ease. We'll provide you with the kind of support you need, when you need it—and you'll be assisted by experienced personnel during each phase of the development process ... and beyond.

\* \* \* \* \* \*

**Marketing**

You can be sure of customers from the moment your restaurant opens for business because long before this important event you'll begin receiving the advantages of Burger Chef's marketing support services.

Outstanding television and radio commercials, newspaper ads, point-of-sale materials and more are available for your own use and combine to spread the word about Burger Chef—and the quality it represents.

Burger Chef's Regional Field Marketing Representative will work with you and provide the help you need to turn your restaurant opening, grand opening and other future events into important community occasions. Burger Chef will make available numerous marketing and public relations tools to help you launch your business venture.

Utilizing the best of creative talent in the areas of advertising and promotion you'll receive the benefit of Burger Chef's fully coordinated advertising and promotion campaigns.

\* \* \* \* \* \*

**CONTINUING SUPPORT**

After your restaurant is open, you'll continue to receive professional assistance and support from Burger Chef's regional operations and functional support departments.

A Burger Chef Field Consultant in your area is responsible for helping you achieve success. You can depend on this person who has already proven to be a successful restaurant manager. Your Field Consultant's years of experience assure you that no details in the operation will be overlooked. The Field Consultant is your personal link with Burger Chef Systems, who will provide you with information and direct you to company resources which will help you maximize sales and profits and operating ability. Periodic visits to your restaurant in response to your personal requests for help and annual comprehensive on-site reviews of your operation will provide you with the professional guidance and information you need to realize your restau-

rant's operational potential. But perhaps most important, your Field Consultant will be there anytime you need help. *Id.* at 8, 10, 11.

Another such document, entitled "Burger Chef, Independence with Security," also was designed to encourage potential franchisees to join the Burger Chef System. Plaintiffs' Ex. 730. That brochure noted that the purchase of the Burger Chef System by General Foods gave the System:

access to the resources of a corporation that extends into almost every field of consumer food products. With General Foods, Burger Chef has continued its growth, providing fast, low-cost, quality food to new markets coast to coast and eventually overseas.

The future growth of Burger Chef depends upon finding qualified ambitious men, like yourself, who are sales and management oriented. The Burger Chef System is within the reach of the small investor providing him with the opportunity to be independent while offering the advantages of a large corporation. And with Burger Chef you are not starting a new or unknown business; opening a Burger Chef franchise is starting another outlet of a successfully established enterprise complete with the knowledge, research, and backing of the corporation and franchisees who have already made Burger Chef successful.

\* \* \* \* \* \*

Each Burger Chef franchisee is an independent businessman who is also a member of the Burger Chef team—a team composed of all the independent franchisees and company store managers with the support of Burger Chef. Each member of the team, whether franchisee, company store manager or at the corporate level, contributes his efforts, ideas, and work to make the Burger Chef System the successful combination of independent businesses with the advantages of a large corporation.

*Id.* at 2–3, 10. The booklet indicated that the franchisee would provide the monetary investment, enthusiasm, hard work and co-operation. In return, General Foods would provide a proven system, the financial advantages of a large corporation, marketing assistance and continuing help and advice.

Still another such undated document, also designed to solicit franchisees, stated:

**BURGER CHEF BACKS YOU UP**

What will Burger Chef do to help you in your business? We won't run your business for you ... and you wouldn't want us to. We offer comprehensive suggestions in the key areas of:

Real Estate and Construction
—site selection
—site planning
—building specifications/drawings
—construction

Training
—restaurant management training
—manager training aids
—hourly employee training aids

Research and Development
—new products
—equipment

Purchasing and Distribution
—supply sources
—specifications
—quality assurance

Field Service
—Area Manager support
—Headquarters support services

Marketing
—promotions
—advertising materials
—test marketing of new products and promotions

Plaintiffs' Ex. 736 at 8. According to Mr. Vaughn, these various brochures, designed to attract new franchisees, were also relevant to him. He asserts that the brochures:

told me what Burger Chef was doing. They were actively seeking franchises. They had the brochures; they were probably mailing them out or giving them to prospective investors.

It also told me and solidified the fact that it was a viable, operationg [sic] system. It told what it would do for the

franchisees if they became franchisees. It gave them all the aspects of how to get into business; told them about training, training their—training them to operate a Burger Chef, the marketing and research and development behind the system.

We—we just—it just solidified everything that we had been doing. We were positive we were going places. I mean that's why I wanted—that's why I was interested in them. That's why I picked them up. That's why I asked for them, if I saw one that I hadn't seen, it was an update.

\* \* \* \* \* \*

They were telling us that the system was going forward and this—this solidified that they were actively seeking franchisees. They had the brochures out. Tr. 830–31, 832.

The Vaughns allege that other misrepresentations were contained in a November 1976 publication entitled "Licen-Scene," the Burger Chef monthly magazine. One article entitled, " 'We/they' is thing of past," written by Phil Korn, stated:

I hope you sensed in all those slides and speeches that a much closer relationship has developed between the company and the franchise community. The "we/they" relationship is a thing of the past: it has to be, because the ultimate success of one party depends to an increasing degree on the success of the other.

Plaintiffs' Ex. 567 at 2. Mr. Vaughn later testified that this publication changed his belief that there was a division between the company and the franchisees:

A There was a time when we very definitely felt that a division between company and franchise stores. This says we're both going to be together, instead of—well, we're going to pull together as a team now. Maybe, maybe it was a feeling that I had, I don't know, but I'm sure that—well, I don't know.

Q When you read it did you believe that?

A I certainly did. I hoped and prayed that that would happen.
Tr. 788.

The March/April 1978 edition of the successor publication to Burger Chef's Licen-Scene, "Chef's Front Page," discussed a new marketing strategy created by General Foods, called "Whatever it Takes." Plaintiffs' Ex. 593. This strategy was implemented at an April 1978 meeting in Innisbrook, Florida, which Mr. Vaughn did not attend. The motto was devised by Terry Collins, the new president of the Burger Chef System, who had been hired from McDonald's. An article, describing the strategy, stated:

The imagery of "Whatever it Takes" focuses on Burger Chef's future. To sum up the 1978 Burger Chef franchise convention in a sentence, "Whatever it takes" in the way of restaurant facilities and equipment, whatever it takes in terms of signage and market identity—in terms of advertising, and promotions, and products, and packaging, and customer service, and System growth— that's what we're going to do in order to usher Burger Chef into the 1980s as an industry leader.

That's a long sentence, but you can take it to mean there's a lot to do. As the theme of the January convention, "Whatever it Takes" was more than a promise: it was a ratification of commitment and a call to action.

"We're determined at Burger Chef to build the finest franchise organization in the country," siad Roger Schafer, vice president of franchise operations, in his headliner address. "We ask nothing less than total commitment from you, and we pledge you nothing less than total commitment from us."

Plaintiffs' Ex. 593 at 2.

The Vaughns also offered testimonial evidence of the alleged misrepresentations to supplement the documentary evidence. Mr. Vaughn testified that many statements made to him by Burger Chef and General Foods' executives lulled him into believing that the System was viable and that Gener-

al Foods was committed to its franchise operation. The first such statement Mr. Vaughn claims to have relied on was a telegram sent to him, in 1968, by Burger Chef's executives, explaining that the System had been purchased by General Foods. Mr. Vaughn testified with respect to a telegram that he received in 1968 informing him that General Foods had acquired the Burger Chef System:

Q When did you first become aware that General Foods had acquired Burger Chef?

A We received a telegram from Frank Thomas, Don Thomas and Bob Wildman; Bob Wildman was a vice-president and Don Thomas was a vice-president, Frank Thomas was president, stating that General Foods had bought Burger Chef Systems.

And also in that telegram they stated how much support and help they would get from General Foods and the system would continue to grow and we would be a viable business, viable fast-food-hamburger system in the country, the most viable thing. I don't recall the exact way it said it.

\*      \*      \*      \*      \*      \*

Q You relied on that telegram?

A I certainly did.

\*      \*      \*      \*      \*      \*

Q Based upon the statements that you heard and the comments made to you in that telegram and the purchasing of the company, what if anything was your understanding with respect to the purchase of Burger Chef by General Foods?

A I understand exactly what the telegram said and what every—all the other communications that we had from Burger Chef System said, that we would continue to grow. It would be a viable business system. Burger Chef would be a business with—they even talked about overtaking McDonald's. I believed everything that it said. I had to believe everything. I was—boy, we're really going, I mean what more could I think than that?

Tr. 657, 658, 660–61. Mr. Vaughn also described statements made at Burger Chef's annual convention in Las Vegas in 1969 regarding the potential of the Burger Chef chain:

Q At that convention did anyone from Burger Chef or General Foods ever make any representations to you that you heard or to the others in attendance at that time about growth or improving your position in the market?

A That was Matt Shannon's primary part of his speech about that, yes, we were going to grow; we were going to get bigger; we were going to be better; we had General Foods behind us. . . .

Q Do you recall seeing a slide presentation at that convention?

A Yes.

Q Could you describe that for us?

A Well, I think the Burger Chef was going to push the clown off the cliff or something like that, or overtake it. I mean it was—I can recall—yes, it was something like that. There were quite a few things like that.

Q What did that signify?

A That meant we were going to overtake McDonald's.

Q Did Mr. Arnett [president of Burger Chef Systems] speak to the convention or address you?

A Yes.

Q What if anything did he say?

A Everything was always along the same line, that now that General Foods is with us we're going to be stronger, we're going to have the financial support of General Foods; we're going to have all the advertising techniques of General Foods; we're going to have all the research and development behind us that General Foods has and can give to us. They're the largest food purveyors in the country and we've got them behind us and they're going to help us.

Tr. 661–63. Another interpretation of the significance of the Las Vegas meeting was presented by Thomas Hughes, a former Burger Chef Area Supervisor. Mr. Hughes stated, "I'll never forget this as

long as I live. There was a slide with the McDonald's clown standing up and the Burger Chef logo pushing him over backwards. In other words, we were going to beat him, the impression he gave me." Tr. 244.

In addition to the statements which the Vaughns claim constitute actionable misrepresentations, they also allege that certain nondisclosures of purportedly material facts constitute actionable misrepresentations. These include: the study known as "Project Beethoven," Plaintiffs' Ex. 164; the recommendations made by Goldman Sachs with respect to the feasibility of selling the System, Plaintiffs' Ex. 66; and the results of the study conducted by Solomon Brothers in 1980 to assess the possibility of selling the System, Plaintiffs' Ex. 791.

The case was tried to a jury. On March 6, 1985, the jury returned a verdict in favor of the Vaughns and awarded actual damages in the amount of $4,800,000 and punitive damages in the amount of $9,200,000. On March 18, 1985, the defendants entered a motion for JNOV or, in the alternative, for a new trial. This motion was denied, and a timely notice of appeal was filed.

## II

The issues before us on this appeal are whether, as a matter of law, the Vaughns stated an actionable claim for fraud; whether punitive damages were available and whether the releases from liability signed by the Vaughns constitute a bar to their claims for fraud. However, before we discuss the substantive issues before us, we note that this case is before us as an appeal from the denial of a motion for a JNOV. Therefore, the following standards govern our consideration of the substantive issues. Jurisdiction in this case is based upon diversity of citizenship. In a diversity action, to determine whether the district judge properly denied the motion for a JNOV, we must look to the appropriate state standard. It is undisputed that this case arises under Indiana law. The Indiana equivalent of a JNOV is a judgment on the evidence pursuant to Ind.Tr.R.

50. According to Rule 50, the motion for a post-verdict judgment on the evidence must be granted where the verdict is not supported by sufficient evidence. In deciding the motion, the trial court must "view only the evidence favorable to the non-moving party and the reasonable inference to be drawn from that evidence." *Huff v. Travelers Indemnity Co.*, 266 Ind. 414, 363 N.E.2d 985, 990 (1977). Accordingly, the "trial court may enter judgment only *if there is no substantial evidence or reasonable inference to be adduced therefrom to support an essential element of the claim,* i.e., the evidence must point unerringly to a conclusion not reached by the jury." *Id.* (citation omitted and emphasis in original).

## III

## FRAUD

The appellants' arguments on appeal focus on the propriety of the district court's allowing the Vaughns' fraud claims to go to the jury. Under Indiana law, the essential elements of fraud are a "material representation of past or existing facts, which representations are false, made with knowledge or reckless ignorance of this falsity, which cause a reliance upon these representations to the detriment of the person so relying." *Whiteco Properties, Inc. v. Thielbar*, 467 N.E.2d 433, 436 (Ind.App. 1984) (quoting *Blaising v. Mills*, 176 Ind. App. 141, 374 N.E.2d 1166, 1169 (1978)). In order to determine the propriety of allowing the fraud claim to go to the jury, we must consider whether the Vaughns established a *prima facie* case of fraud. Accordingly, we shall consider each element of the fraud claim separately.

### A. *Material Misrepresentation*

The first element of fraud is that the defendant must have made a material misrepresentation of a past or existing fact. *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 42 (Ind.App.1980). The false statement must be made knowingly or with reckless disregard for its falsity. Both omissions

and misrepresentations are actionable under Indiana law. According to the appellants, the Vaughns' claim fails to meet this first prong in two respects: (1) the statements upon which the Vaughns purportedly relied were not "facts," and the statements made by General Foods all related to future rather than past or existing events, *see Royal Business Machines v. Lorraine Corp.*, 633 F.2d 34, 45 (7th Cir.1980); and (2) General Foods had no duty to disclose all available facts to the Vaughns.

### 1. Fact v. Opinion

First, the appellants argue that any representations made to the Vaughns were opinions and, in any event, were statements of future rather than past or existing facts. It is well-settled that "[a] statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation." *Metropolitan Bank & Trust Co. v. Oliver*, 4 Ill.App.3d 975, 987, 283 N.E.2d 62, 64 (1972); *see Peterson Industries, Inc. v. Lake View Trust and Savings Bank*, 584 F.2d 166 (7th Cir.1978). Expressions of opinion are not actionable, and the court should refuse to submit such statements to the jury. *Plymale v. Upright*, 419 N.E.2d 756, 760–61 (Ind.App.1981) (citing 37 C.J.S. *Fraud* §§ 55, 124); *see Montgomery Ward & Co. v. Tackett*, 163 Ind. App. 211, 323 N.E.2d 242, 248 (1975).

The Vaughns counter that the distinction between fact and opinion has been considered a "logical absurdity." *See Whiteco Properties*, 467 N.E.2d at 437 (citing Calamari & Perillo, *Contracts* § 9–17 (2d ed. 1977)). However, the distinction is both recognized and applied by the courts. *See Royal Business Machines*, 633 F.2d 34. The distinction between a fact and an opinion was accurately delineated by the *Whiteco Properties* court. The court noted that the distinction, "serves to deny relief

to persons who unjustifiably rely on a seller's 'puff' or 'trade talk.'" 467 N.E.2d at 437 (citing Calamari & Perillo, *Contracts*, *supra*, § 9–17). An opinion is a subjective statement of belief "on which no reasonable [person] should justifiably rely." *Whiteco Properties*, 467 N.E.2d at 437. On the other hand, an unqualified guarantee is "an objective statement of fact" upon which reliance may be justified. A statement may be characterized as one of fact if the content of the statement is susceptible of "exact knowledge" at the time the statement is made. *Smart & Perry Ford Sales, Inc. v. Weaver*, 149 Ind.App. 693, 274 N.E.2d 718, 721 (1971).

We have reviewed the record carefully. On the basis of that review, we can only conclude that the statements made by General Foods to its franchisees and to prospective franchisees were statements of opinion. In a sales or marketing context, and franchisor-franchisee negotiations certainly are to be placed in that context, such expressions of opinion are known as "puffing," "trade talk," or "sales talk" and do not constitute actionable fraud. *See Wisconics Engineering, Inc. v. Fisher*, 466 N.E.2d 745, 756 (Ind.App.1984); *Kluge v. Ries*, 66 Ind.App. 610, 117 N.E. 262 (1917); *Voorhees v. Cragen*, 61 Ind.App. 690, 112 N.E. 826 (1916). We believe that General Foods' statements regarding the "viability" of the System could only be characterized as "puffing." [2] They were not a guarantee of a particular degree of success. Indeed, success is itself a subjective term. General Foods' statements regarding the potential of the company were designed to encourage investment by new franchisees and to stimulate the existing franchisees' enthusiasm. On the evidence presented here, the jury could not have found that, at any given moment during the period in question, General Foods or Burger Chef had a firm, present intention to make the System anything other than "viable." While the evidence does show that management, at

---

**2.** Viability has been defined as "capable of working, functioning, or developing adequately" or "having a reasonable chance of success."

Webster's Ninth Collegiate Dictionary 1313 (1985).

various times, thought that viability could best—or only—be achieved through a readjustment of the franchisor-franchisee relationship and by eliminating franchisees who were unwilling to adjust or were inefficient, such management strategy is hardly actionable as fraud.[3] That General Foods' idea of viability did not match the Vaughns' expectations is unfortunate—but it is not fraud. In Indiana, a statement of opinion is actionable as fraud only in limited circumstances which have been described as follows:

> Where the vendee is wholly ignorant of the value of the property, and the vendor knows this, and also knows that the vendee is relying upon his (the vendor's) representation as to the value, and such representation is not a mere expression of opinion, but is made as a statement of fact, which statement the vendor knows to be untrue, such a statement is a representation by which the vendor is bound.

*Boltz v. O'Connor*, 45 Ind.App. 178, 90 N.E. 496, 497 (1910) (quoting *Murray v. Tolman*, 162 Ill. 417, 44 N.E. 748 (1896)). That is not the situation here. The Vaughns were fully aware of the value of their properties (at least, by virtue of annual tax filings), and they willingly renewed their franchise agreements with Burger Chef despite any feelings of dissatisfaction they may have harbored. The record makes clear that the Vaughns were fully aware of the intense competition they faced

in the fast food arena from such chains as Burger King, Wendy's and McDonald's. Tr. 672, 794–96. The record establishes that the Vaughns had an adequate opportunity not only to assess the Burger Chef System's viability but also to evaluate their own enterprise's viability. Their decision to remain with the Burger Chef System was based on the exercise of their own business judgment. They did not rely blindly on the appellants' opinions regarding the System's future. In the final analysis, the Vaughns believed what they wanted to believe—that the System would work, that they would prosper, that General Foods would make it so. However, General Foods was not offering a panacea; rather, it was simply offering its opinion as to how the System would perform.

### 2. Present v. Future

■ Even assuming we could accept the Vaughns' position that the statements made by General Foods could be characterized as facts rather than opinions, we face another impediment to finding such statements actionable. Appellants also contend that they made no statement regarding "existing" facts; rather, they made statements regarding future events. It has long been the law in Indiana that an action for fraud cannot be based "upon promises to be performed in the future." *Smith v. Parker*, 148 Ind. 127, 45 N.E. 770, 771 (1897); *see also Whiteco Properties*, 467 N.E.2d at 436; *Tutwiler v. Snodgrass*, 428

---

**3.** According to Thomas Hughes, a former Burger Chef Area Manager and Field Consultant, new strategies to improve the business were openly discussed at meetings between management and the franchisees. As the following excerpt reveals, these strategies were not necessarily popular with or beneficial to every franchisee:

> Q [C]an you tell us what conclusions were discussed with regard to the impact on the competitiveness of the Burger Chef System 1968 to 1980 based on the lack or the decline and growth of the system compared to the rapid increase in growth of Burger Chef's major hamburger fast-food competitors?
>
> \* \* \* \* \* \*
>
> A Well, the impact is obvious. We either have to grow or we were in trouble. You either had to start building new restaurants or

there were going to be some franchisees that didn't make it.

> I can remember Terry Collins [President of Burger Chef] was asked a question by Dave Poulin, who was a franchisee in Denver. He said, we're developing the heartland first, and Dave Poulin stood up and said, "I'm from Denver and—"
>
> \* \* \* \* \* \*
>
> THE WITNESS: Mr. Poulin had five or six stores in the Denver market, which was not designated as a development market, and he was about at the break-even point in those restaurants.
>
> And so he asked Mr. Collins what he was going to do until Burger Chef got around to developing his area of the country, and Mr. Collins said, "I just hope you're still around." Tr. 266–67.

N.E.2d 1291, 1296 (Ind.App.1981); Plymale, 419 N.E.2d at 760; *Middelkamp v. Hanewich*, 147 Ind.App. 561, 263 N.E.2d 189, 192 (1970); *Sachs v. Blewett*, 206 Ind. 151, 185 N.E. 856 (1933). In fact, the Supreme Court of Indiana has expressly stated that "actionable fraud cannot be predicated upon a promise to do a thing in the future, although there may be *no intention of fulfilling the promise.*" *Sachs*, 185 N.E. at 858 (emphasis supplied). This principle has been applied uniformly by this court in fraud cases arising under Indiana law. *See, e.g., Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512, 525 n. 10 (7th Cir.1983); *Royal Business Machines*, 633 F.2d at 45; *Grande v. General Motors Corp.*, 444 F.2d 1022, 1025 (7th Cir.1971); *see also Fowler v. Hilliard*, 585 F.Supp. 1320, 1323 (S.D.Ind.1984). As we have already noted, even respecting the jury's privilege to make an assessment as to credibility, the record will not support a finding that the appellants made affirmative factual misstatements of their current policy. Moreover, to a very great degree, the appellants' statements with respect to their "commitment" to growth and viability must be characterized as necessarily relating to the future. General Foods' and Burger Chef's statements to the franchisees were clearly intended to bolster morale—to allay any sense that the franchisees were on their own. The Company repeated again and again that it was committed to making *the System* viable—not that it would turn around the business of *each franchisee* but that *the System* would prosper.

Our review of the record convinces us that the real gravamen of the Vaughns' case is not that they were affirmatively misled by the appellants' misstatement of material facts. Rather, they are unhappy with the degree of success which they achieved. However, the law of fraud is not meant to protect a franchisee against a franchisor's allegedly mediocre performance. Had the Vaughns been able to show that General Foods had made certain promises to them with respect to the future of their franchises, perhaps they would have stated an implied contract claim. However, in this case, the district court dismissed the Vaughns' claims for breach of contract and fiduciary duty at the close of their cases. The Vaughns should not be permitted to achieve by indirection what they have been precluded from doing directly.

### 3. *Nondisclosures*

▇ The Vaughns also claim that various nondisclosures of allegedly material information constitute actionable fraud. In essence, they claim that the purported affirmative misrepresentations coupled with these omissions constitute actionable fraud. We disagree.

The Vaughns argue that General Foods should have revealed all of its contingent plans and the results of the various surveys that they had commissioned to the franchisees. The nondisclosure of these documents and plans purportedly misled the Vaughns as to the status of the System. The documents in question included the August 1978 study entitled "Project Beethoven," Plaintiffs' Ex. 941; the results of the 1975 Booz-Allen & Hamilton study which recommended implementation of a new policy for the System, Plaintiffs' Ex. 980; the recommendations proffered by Goldman Sachs in 1978, Plaintiffs' Ex. 624; and the 1980 study performed by Salomon Brothers evaluating the advisability of selling the System, Plaintiffs' Ex. 791. According to the Vaughns, had they been privy to such information, they might not have made further investments in their franchises. Tr. 738. In response, General Foods submits that it was not under an affirmative duty to disclose all material facts to the Vaughns.

Under Indiana law, "the failure to disclose all material facts, by a party on whom the law imposes a duty to disclose, constitutes actionable fraud." *Grow v. Indiana Retired Teachers Community*, 149 Ind. App. 109, 271 N.E.2d 140, 145 (1971) (en banc); *see Indiana Bank & Trust Co. v. Perry*, 467 N.E.2d 428 (Ind.App.1984) (omission is actionable where there is a duty to disclose). "As a matter of law,

where there is no duty to speak or disclose facts, silence will not constitute actionable fraud." *Barnd v. Borst,* 431 N.E.2d 161, 168 (Ind.App.1982). We do not believe that such a duty existed here.

As a preliminary matter, we note that neither party claims, at this stage of the litigation, that they were involved in a fiduciary relationship. The district court dismissed the Vaughns' breach of fiduciary duty claim finding that there was "no ... evidence from which reasonable inferences can be drawn by which reasonable persons could find a fiduciary relationship between plaintiffs and defendants." Tr. 1193. The Vaughns correctly state that it is possible for a duty to disclose to exist in the absence of a fiduciary duty. However, for the duty to exist, it must be shown that "either one or each of the parties, in entering into the contract or other transaction expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence ... is necessarily implied." *Peoples Trust and Savings Bank v. Humphrey,* 451 N.E.2d 1104, 1112 (Ind. App.1983) (quoting *McNair v. Public Sav. Ins. Co. of America,* 88 Ind.App. 386, 163 N.E. 290, 293 (1928)). However, not every relationship involving confidence and trust will support a duty to disclose. One Indiana court has stated that a duty to disclose may arise "where there is a blood, marital or fiduciary relationship." *Grow,* 271 N.E.2d at 143. The court also indicated that these relationships may arise "because of personal friendship and when one party knows that the other is relying upon him in such a manner. It is essential that there be a dominant and a subordinate party...." *Id.* The record makes it clear that no such relationship existed between these parties. The relationship between the Vaughns and General Foods was an arms-length one. Over the course of their fourteen-year association with General Foods, the Vaughns were in a position to assess for themselves the viability of the System. As we noted, *supra,* the Vaughns received annual reviews of the profitability levels of their stores and were fully cognizant of the extent of their competition in the area. General Foods and Burger Chef constantly reassessed the course of their business; the Vaughns had an opportunity to do the same. Neither party was under an obligation to disclose its information-gathering or business analysis to the other. Each had to decide—and had an opportunity to decide—its future course.[4]

---

4. Count III of the Vaughns' amended complaint alleged, in addition to the Indiana common law fraud claim, a violation of the Illinois Franchise Disclosure Act, Ill.Ann.Stat. ch. 121½, ¶ 701 *et seq.* Over objection, the district judge instructed the jury that:

Under the Illinois Franchise Disclosure Act, it is unlawful for any person, in connection with the offer or sale of any franchise, directly or indirectly, to

(a) Employ any device, scheme, or artifice to defraud;

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

If you find from a consideration of all the evidence, that defendant Burger Chef Systems, and/or defendant General Foods Corporation did any of the aforementioned acts, then you must find the defendants liable under the Illinois Franchise Disclosure Act.

As defined in the statute, "sale" includes "every ... disposition of a franchise or interest in a franchise for value."

The plaintiffs must prove, by a preponderance of the evidence, that the statements made by either Burger Chef Systems, Incorporated, or General Foods Corporation or both, if fraudulent, were a direct or immediate cause of plaintiffs' damages.

Tr. 1819–20.

General Foods argues on appeal that, even under the Illinois statute, the Vaughns' claim must fail. For the reasons set forth *supra* in the discussion of the Indiana common law fraud claim, we agree. We need not discuss the question whether the Vaughns' disposition of two franchises after 1979 falls within the ambit of the statute. Instead, we repeat our conclusion that the statements made by General Foods to the Vaughns were not fraudulent, and, therefore, they were not actionable. As the Vaughns themselves indicated in their "Reply to Defendants' Memorandum in Support of Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial," "by reason of the

## B. *Reliance*

The second element of a fraud claim is reasonable reliance on the part of the plaintiff on the material misrepresentations of the defendant. *Tutwiler*, 428 N.E.2d at 1296. Reliance has been deemed justifiable where all of the material facts were "exclusively within the knowledge of [the sellers], and the purchasers had no means of independently ascertaining the truth." *Whiteco Properties*, 467 N.E.2d at 437; *see Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1981); *Plymale*, 419 N.E.2d at 762. The person claiming reliance upon a representation must exercise ordinary care in guarding against the fraud. *Carrell v. Ellingwood*, 423 N.E.2d 630, 635 (Ind.App.1981). He cannot ignore what his own investigation has revealed and later claim that he was defrauded by the actions of the other party. *See Peterson Industries*, 584 F.2d at 168; *South v. Colip*, 437 N.E.2d 494 (Ind.App.1982); *Plymale*, 419 N.E.2d 756.

The Vaughns correctly state that the fact of reliance is a jury question. *See Fleetwood Corp.*, 404 N.E.2d at 45. However, it is also important to remember that the *fact* of reliance is different from the *right* of reliance. Thus, to state a cause of action for fraud, a party must prove not only that he acted in reliance but also that he had the right to do so:

> Where the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation and whether he was negligent in doing so. Generally, however, it is for the jury to determine as a question of fact whether on all the facts in evidence plaintiff was justified in relying on defendant's statements, whether the representations were of such a character and were made under such circumstances that they were likely to deceive plaintiff, whether plaintiff

could by ordinary diligence have discovered their falsity, and whether plaintiff was negligent in relying on the representations and in failing to make an independent investigation of the facts.

37 C.J.S. *Fraud* § 129, at 455–56 (1955); *see Plymale*, 419 N.E.2d at 763 & n. 6.

The Vaughns argue that they did, in fact, rely on the statements made to them by General Foods regarding advertising, investment, commitment and growth. They claim that, in reliance on the assurances of the Company, they invested $6.3 million in their six restaurants over the course of fourteen years. The Vaughns assert that it was impossible for them to see through the misrepresentations made to them regarding the System. However, on this record, we must conclude that, although the Vaughns may in *fact* have relied on the representations of the defendants, they had no *right* to rely on them. Neither the nature of those representations nor the relationship of the parties permitted the Vaughns to rely on such material in making their independent decisions. Nor can the Vaughns successfully argue that the necessary information was within the exclusive control of the defendants. On this record, it is firmly established that the Vaughns cannot be characterized as unaware of the status of the System. They were constantly and continuously apprised of the status of their operation as well as the actual contributions and expenditures made by General Foods to the System.

## C. *Damages*

The final element of an actionable fraud claim is injury. As a general proposition, damages in a fraud action must "be the natural and proximate consequence of the act complained of." *Smart & Perry Ford Sales, Inc.*, 274 N.E.2d at 725 (quoting *Linderman Machine Co. v. Hillenbrand Co.*, 75 Ind.App. 111, 127 N.E. 813, 815 (1921)). Thus, the claimant's reliance on the alleged misrepresentations must be detrimental. *See Tutwiler*, 428 N.E.2d at

entry of a general verdict, the claim for violation of the Illinois Act is subsumed in the gener-

al verdict of fraud...." R. 326 at 40.

1297; *Fleetwood Corp.*, 404 N.E.2d 38. Benefit of the bargain damages are available in a fraud action only where the bargain is not what it was represented to be. *See Carl Call, Inc. v. B.P. Oil Corp.*, 554 F.2d 623 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). In the foregoing subsections, we have held that, as a matter of law, the appellants did not make factual misstatements upon which the Vaughns had a right to rely. It follows, therefore, that any loss which the Vaughns may have suffered was not the result of fraudulent conduct of the defendants.

■ However, even if we were to assume that the defendants had made such factual statements and that the Vaughns could have justifiably relied upon those statements, it would be difficult, on this record, to hold that the Vaughns had sustained their burden of proving that the alleged damages were caused by the defendants' conduct. We also note—although we find it unnecessary to reach the question—that it is not at all certain that the Vaughns could have, on this record, established, with a reasonable degree of certainty, the amount of damage attributable to the actions of the defendants. *See Whiteco Properties*, 467 N.E.2d at 438. While the amount of damage need not be determined with mathematical precision, it must be supported by the evidence in the record. *First National Bank of New Castle v. Acra*, 462 N.E.2d 1345, 1351 (Ind. App.1984); *Colonial Discount Corp. v. Berkhardt*, 435 N.E.2d 65 (Ind.App.1982); *Indiana Bell Telephone Co. v. O'Bryan*, 408 N.E.2d 178, 184 (Ind.App.1980); *Friendship Farms Camps, Inc. v. Parson*, 172 Ind.App. 73, 359 N.E.2d 280 (1977). The award "may not be based upon mere conjecture, speculation, or guesswork." *Whiteco Properties*, 467 N.E.2d at 438 (citing *Stoneburner v. Fletcher*, 408 N.E.2d 545 (Ind.App.1980)).

## IV

## RELEASES

■ The appellants also contend that the twenty-four mutual releases signed by the Vaughns constitute a bar to suit. We have already concluded that there was no fraud perpetrated on the Vaughns. However, as an alternate ground for our disposition of this case, we conclude that, as a matter of law, the mutual releases executed by the parties are a bar to this action.

The releases signed by the Vaughns provided:

Except for payments arising in the ordinary course of business which are now due ... each of us therefore releases the other and any parent ... corporations, from all claims and demands whatsoever, however, wherever, and whenever they may have arisen, down to date.

Plaintiffs' Ex. 4.

As a general proposition, Indiana has long recognized the "important policy of upholding releases in order to facilitate the orderly settlement of disputes." *Indiana Bell Telephone Co. v. Mygrant*, 471 N.E.2d 660, 664 (Ind.1984); *Grimm v. F.D. Borkholder Co.*, 454 N.E.2d 84, 87 (Ind.App. 1983). While there appears to be an absence of Indiana authority directly on point, the enforceability of releases in the franchise context has been consistently upheld. *See Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir.1975); *Redel's Inc. v. General Electric Co.*, 498 F.2d 95 (5th Cir.1974); *Schmitt-Norton Ford, Inc. v. Ford Motor Co.*, 524 F.Supp. 1099 (D.Minn.1981), *aff'd* 685 F.2d 438 (8th Cir. 1982).

The Vaughns argue that these releases are unenforceable for three reasons: (1) there was a lack of consideration; (2) they were the product of economic duress; (3) they were induced by fraud. In our view, each of these contentions is without merit. It is clear that there was adequate consideration since each of the releases was given in exchange for making, renewing, extending or modifying the terms of franchise agreements. Moreover, the agreements were mutual. Each party released the other from claims which may have risen other than those "for payments arising

in the ordinary course of business which are now due."

The claim of economic duress is likewise without merit as a matter of law. Indiana does not recognize economic duress as a defense. *Raymundo v. Hammond Clinic Association*, 449 N.E.2d 276, 282 (Ind. 1983). Moreover, the undisputed evidence of record demonstrates that the Vaughns continued their relationship with the defendants as a result of their own business judgments. Indeed, the Vaughns have conceded that they were aware of their right to consult an attorney prior to signing the agreements containing the releases and stated that, on at least one occasion, an attorney was consulted prior to the signing of the agreement. Tr. 949–50. Indiana does recognize the general rule that "[f]raudulent inducement ... can vitiate a release." *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1314 (5th Cir. 1983); *Raymundo*, 449 N.E.2d 276; *Indiana Steel & Wire Co. v. Studes*, 187 Ind. 469, 119 N.E. 2, 4 (1918). However, to a large extent, the Vaughns' allegations in support of this defense are simply a replay of their general fraud allegations. We have already held that the record simply will not support these allegations. Moreover, as the Fifth Circuit noted in *Ingram*, "[p]arties bargaining at arms length who are not in a fiduciary relationship with one another are not required to make known all possible claims against one another." 698 F.2d at 1315.

### CONCLUSION

Jury verdicts are not to be overturned lightly. Before taking such a step, a reviewing court must not only ascertain carefully the governing law but also review, with the utmost care, the record of trial. In undertaking this latter task, we must tread carefully. Fact-finding is the jury's role and the parties have a right to expect that, mindful of the guarantee of the seventh amendment, we shall not intrude upon that role and substitute our own judgment. Nevertheless, it is our function to determine, in the final analysis, whether the law

and the evidence support the jury's verdict. Here, we must conclude that the verdict cannot stand. Since the district court should have granted the motion for JNOV, its judgment is reversed.

REVERSED.