**REGINALD MARTIN AGENCY, INC., Comprehensive Insurance Marketing, Inc., Design Benefits, Inc., Jim Jasnoski, Design Benefits, Inc., Kenny Froug, Atlanta Brokerage Office, Brokerage One Agency, Inc., Tri–State Brokerage, Inc., Don Sepulveda, Sepulveda Insurance Group, Whitewater Brokerage, Inc., Professional Insurance Brokerage, Inc., Plaintiffs,**

v.

**CONSECO MEDICAL INSURANCE COMPANY, Washington National Insurance Company, Defendants.**

**No. 1:04–cv–01587–TAB–RLY.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 5, 2007.

Lawrence Lee Bennett, Jr., Mark Van Spix, Spix & Krupp, Spencer J. Krupp, Spix & Krupp, Atlanta, GA, Bernard Lowell Pylitt, Kristopher N. Kazmierczak, Offer Korin, Sally F. Zweig, Katz & Korin, Indianapolis, IN, for Plaintiffs.

David Brian O'Dell, Edward Devereaux Cotter, Gary Lane Howard, Jamie Lee Moore, Paul Peter Bolus, Burr & Forman LLP, Birmingham, AL, Scott A. Weathers, Huffer & Weathers, Indianapolis, IN, for Defendants.

## ENTRY ON DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

BAKER, United States Magistrate Judge.

### I. Introduction.

Defendant Conseco Medical Insurance Company ("CMIC") withdrew from the major medical insurance market in various states and terminated its relationship with Plaintiffs—all insurance agents/brokers—in early 2002. Plaintiffs' suit against CMIC and Washington National Insurance Company[1] alleges theories of fraud and deceit, constructive fraud, fraudulent con-

---

1. As it did in disposing of Defendants' first motion for summary judgment [see Docket No. 64], the Court collectively refers to these Defendants as "CMIC" since CMIC merged with co-Defendant Washington National Insurance Company some time ago.

cealment, fraudulent inducement, breach of fiduciary duty, tortious interference with a prospective business advantage, and promissory estoppel.[2] CMIC seeks summary judgment on these claims arguing that, among other things, it acted in accordance with a valid contract, its acts were not fraudulent, nor did it owe a fiduciary duty to the Plaintiffs because no special relationship existed between the parties. Both parties request that the Court strike certain evidence designated in support and opposition of summary judgment. [See Docket Nos. 147, 153.] As explained in more detail below, the Court denies these requests. With respect to summary judgment, the Court grants in part and denies in part CMIC's motion [Docket No. 113]. CMIC's motion for summary judgment as it relates to Plaintiffs' promissory estoppel and tortious interference claims is granted. The Court denies CMIC's motion concerning Plaintiffs' breach of fiduciary duty, deceit, and fraud-based claims.[3]

## II. Challenged evidence.

◼ In ruling on a motion for summary judgment, it is well-settled that the Court may only consider evidence that would be admissible at trial under the Federal Rules of Evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). Thus, the Court will address the parties' respective evidentiary challenges.

### A. Plaintiffs' request to strike evidence.

Plaintiffs challenge three categories of documents proffered by CMIC: (1) Michele Schlafer's affidavit as not properly based on her personal knowledge; (2) marketing director appointment agreements as not material or relevant; and (3) excerpts from Thomas Brophy's deposition as inadmissible hearsay. [Docket No. 147 at pp. 26–27, 36.] CMIC opposes Plaintiffs' challenges. [Docket No. 151.]

Federal Rule of Civil Procedure 56(e) requires affidavits "be made on personal knowledge ... set forth such facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, summary judgment affidavits create an issue of fact only to the extent that they "provide evidence that would be admissible if offered live on the witness stand." *Watson v. Lithonia Lighting*, 304 F.3d 749, 751–52 (7th Cir. 2002). With this standard in mind, CMIC's evidence is admissible.

◼ Plaintiffs challenge Schlafer's affidavit primarily from two angles. Plaintiffs contend: (1) Schlafer "does not state that she has personal knowledge about Plain-

---

2. The Plaintiffs also originally asserted a claim for breach of contract [see Docket No. 40] but the Court granted CMIC's first motion for summary judgment on that claim. [Docket No. 64.]

3. Inherent in this decision, the Court denies CMIC's request for summary adjudication of Plaintiff Don Sepulveda's claims. CMIC contends that Sepulveda's testimony belies any instance of damages and thus entitles CMIC to summary judgment. Sepulveda's testimony only establishes that as of the date of his deposition he has recovered from any alleged damage. CMIC's interpretation overreaches

and ignores the possibility that despite Sepulveda's return to profitability, his later profit may not completely offset claimed damages. Likewise, CMIC's damages-based argument regarding all Plaintiffs does not entitle CMIC to summary judgment. Plaintiffs have presented evidence that they lost business as a result of CMIC's alleged fraud and breach of fiduciary duty. How much loss they can establish remains a question of fact for trial. Moreover, CMIC waived this argument at the summary judgment stage by raising it for the first time in its reply. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir.2003).

tiffs' relations with other insurers"; and (2) "she fails to establish a foundation for her conclusory opinions. . . ." [Docket No. 147 at p. 26.] CMIC counters that Schlafer's "testimony did not concern Plaintiffs' contracts with other insurers . . . ." and that she has demonstrated sufficient personal knowledge to attest to the sales representative agreement between Plaintiffs and CMIC. [Docket No. 151 at p. 3.] CMIC further explains that, with respect to Schlafer's testimony concerning standard practice and parties to the sales representative agreements, Plaintiffs did not challenge the cited deposition testimony of Plaintiff Steven Smith, which allegedly supports the same fact. [*Id.*]

The Court overrules Plaintiffs' objections to Schlafer's affidavit for two reasons. First, Schlafer has, however minimally, established a basis for personal knowledge regarding CMIC's standard practices.[4] Further, much of what she testifies to regarding CMIC's standard practices and sales representative agreements is corroborated by Plaintiff Steven Smith's own testimony. Thus, Schlafer's testimony in this regard does not offend Rule 56(e), and Plaintiffs' motion to strike this affidavit is denied.

■ The Court can make short work of Plaintiffs' final two objections to CMIC's evidence. Plaintiffs object to CMIC's statement that "withdrawal and termination clauses are standard in insurance contracts" on the basis that this is "immaterial and irrelevant" evidence. [Docket No. 147 at p. 27.] As CMIC details, this statement is amply supported by Plaintiffs'

testimony. [Docket 151 at pp. 5–6.] While this evidence may ultimately prove immaterial to summary judgment, materiality cannot be confused for admissibility. CMIC's evidence is not inadmissible or otherwise improper, and the Court overrules Plaintiffs' objection to this evidence.

Plaintiffs lastly contest CMIC's statement of fact attributed to Thomas Brophy that CMIC "worked towards its goal of 'manag[ing] the remaining business toward profitability'" on the basis that it is hearsay. Plaintiffs offer no explanation or analysis for why this is hearsay, and it is unlikely that any viable theory exists. Upon reviewing the testimony in question, the Court finds this statement is in fact supported by Brophy's own statement, which is based on his own personal knowledge. It is not hearsay. Accordingly, the Court overrules this objection as well.

### B. CMIC's objections to Plaintiffs' evidence.

CMIC takes issue with Plaintiffs' supplemental affidavits.[5] As set forth above, Rule 56(e) mandates that affidavits must be "made on personal knowledge . . . set forth facts as would be admissible in evidence . . . and show affirmatively that the affiant is competent to testify to the matters stated therein. . . ." CMIC contends that these affidavits do not comport with Rule 56(e) in that the affidavits contain: (1) information not based on personal knowledge; (2) portions directly contradicting Plaintiffs' deposition testimony; (3) testimony regarding subproducers' thoughts and opinions that are hearsay

---

4. In its current state, however, Schlafer's testimony is of little utility in this matter because she does not attest to what period of time her testimony is relevant.

5. Plaintiffs first submitted affidavits in opposition to CMIC's motion to dismiss, which the Court converted into a partial motion for

summary judgment. [See Docket Nos. 45, 64.] Plaintiffs resubmit these same affidavits in opposition to CMIC's second motion for summary judgment, and they are unchallenged by CMIC. Rather, it is Plaintiffs' second affidavits—submitted for the first time with their second motion for summary judgment—that CMIC contests.

and/or speculation; (4) character evidence that is prohibited by Rule 608(a); and (5) portions that assume facts not in evidence. [Docket No. 154.][6]

### 1. Lack of personal knowledge.

CMIC objects to the supplemental testimony of nine Plaintiffs[7] to the extent this testimony is too similar and in one paragraph adopts the testimony of Plaintiff Steven Smith. Specifically, CMIC contends that paragraph 32 of these affidavits cannot be based on each affiant's personal knowledge. In support, CMIC directs the Court's attention to one district court case that rejected a plaintiff's affidavit because it adopted by reference the plaintiff's attorney's representations, *Rembert v. Holland*, 735 F.Supp. 733, 736 (W.D.Mich. 1990). Neither CMIC's cited authority nor its reasoning is persuasive in this instance.

■ As Plaintiffs note, these affidavits "recount information and personal knowledge learned from sensory experiences, sense data or inferences therefrom...." [Docket No. 155 at p. 9.] Plaintiffs assert that their knowledge and experience are nearly identical since CMIC allegedly treated them "uniformly" and made the same alleged misrepresentations to each Plaintiff. [*Id.*] Plaintiffs' affirmations that their experience was similar to that of a co-Plaintiff can hardly be analogized to the scenario noted without discussion in *Rem-*

*bert* where a plaintiff adopted by reference representations of his attorney—someone who presumably had no personal knowledge of plaintiff's experience. In this instance, each Plaintiff has sufficiently established a basis for personal knowledge, and the fact that several Plaintiffs attest to the similarity of their experience with another Plaintiff is not improper. Likewise, the similarity of the wording does not provide an adequate reason for striking any portion of these affidavits. *See Visser v. Packer Engineering Assoc. Inc.*, 924 F.2d 655, 659 (7th Cir.1991) (court held "the fact that the affidavits use almost identical words and obviously were drafted by a lawyer" did not render affidavits inadmissible). At best, CMIC's concern goes to credibility, not admissibility. Thus, the Court overrules CMIC's general objection to Plaintiffs' affidavits and its specific objection to paragraph 32 of the affidavits of Plaintiffs Kenny Froug, James Jasnowski, Joe Kanatzar, Reginald Martin, Lawrence J. Noell, Kurt Reichley, Ralph C. Rustemeyer, Michael Schewenkner, and Donald Sepulveda.

### 2. Testimony contrary to deposition testimony.

■ CMIC challenges representations in these second affidavits primarily regarding CMIC's alleged misrepresentation of its commitment to the major medical business.[8] [Docket No. 154 at p. 8.] Where an

---

6. Plaintiffs assert that CMIC's objections, filed as a separate motion, should not be considered by the Court because of CMIC's alleged disregard for the local rules, which disfavor such collateral motions. [Docket No. 155.] Plaintiffs are technically correct, but strict compliance with the local rule is not essential in this case given the particular nuances of this matter. Consequently, the Court overrules Plaintiffs' objection to CMIC's separately filed challenge to Plaintiffs' evidence.

7. The specific affidavits at issue on this point are those from Kenny Froug, James Jasnow-

ski, Joe Kanatzar, Reginald Martin, Lawrence J. Noell, Kurt Reichley, Ralph C. Rustemeyer, Michael Schewenkner, and Don Sepulveda.

8. CMIC initially objected to Plaintiffs' representations regarding limited experience in the insurance industry as it relates to termination provisions and standard practice. However, CMIC did not reply to Plaintiffs' argument in response that these statements were consistent with Plaintiffs' deposition testimony. In failing to do so, CMIC tacitly concedes the propriety of Plaintiffs' testimony in this respect.

affiant, within the same affidavit, cannot provide a plausible explanation for any discrepancy between the affidavit testimony and previous deposition testimony, a court may not properly consider the affidavit testimony. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 758–59 (7th Cir.2006). Nevertheless, the Court is baffled by CMIC's insistence that this representation is somehow inconsistent with Plaintiffs' deposition testimony. For instance, CMIC's own recitation of Kanatzer's deposition belies CMIC's argument. When asked during his deposition, "tell me what you are claiming that Conseco Medical has done to you that is wrong?" Kanatzer answered in part, "They had me sign a contract in 2001 when they knew they were going to do something different, and 'something different' was *exiting* the major medical business." [Kanatzer Dep. at p. 73] (emphasis added). That Kanatzer did not use the actual word commitment does not mean that his answer was not directly on point with his allegation that CMIC had misrepresented its commitment to the major medical business. The Court finds the same is true with the other six Plaintiffs' testimony.[9] Accordingly, the Court overrules CMIC's objection to statements made by these seven Plaintiffs concerning CMIC's alleged misrepresentation of its commitment to the major medical business.

### 3. Testimony regarding subproducers' thoughts and opinions.

 CMIC takes issue with certain portions of paragraphs 27–30, and argues that these paragraphs contain a mix of hearsay and speculation. [Docket No. 154 at pp. 5–7.] The portions of these paragraphs that CMIC challenges are:

I always knew that my strong bonds with my subproducers would allow me to move them to another carrier if necessary.

My subproducers followed my business judgment. If I decided to use a certain product or move to another carrier, they relied upon me and followed my judgment. My sub-producers relied upon me to research and recommend the best and most reliable insurance products to them.

The subproducers ... underlying loyalty was to my business and me and this relationship was destroyed by CMIC's misrepresentations. In 2001, I could have chosen to not renew the FMO agreement and moved my subproducers to a different carrier.

My subproducers relied on facts about Conseco's financial strength and commitment to the industry that were told to me by CMIC's representatives over the years. When the non-renewals occurred with virtually no warning, I lost all credibility with my subproducers and they moved on to place their insureds with other carriers. Most of my subproducers would not even talk to me.

CMIC contends that these portions "... have done nothing more than state Plaintiffs' own opinions and impressions as to the state of mind and intent of their subproducers (sic)." [*Id.* at p. 6.] Plaintiffs respond that these paragraphs represent Plaintiffs' explanation of their own state of mind and real options they believed were before them between 2000 and 2002. [Docket No. 155 at p. 11.]

Had Plaintiffs offered the representations to prove the truth of the matter asserted, CMIC's arguments might be well taken. But Plaintiffs do not offer them for

---

9. Moreover, prior to their depositions, each of these Plaintiffs testified regarding his allegation that CMIC misrepresented its commit-ment to the major medical business. This evidence is unchallenged by CMIC.

such purpose. As such, Plaintiffs' statements are not hearsay. Fed.R.Evid. 802. Similarly, these representations are only speculation if Plaintiffs offer them as evidence of what their subproducers thought with respect to their business dealings with Plaintiffs. Instead, Plaintiffs offer them as evidence of their own state of mind. Accordingly, the Court does not strike this evidence but limits its application in a manner consistent with this finding.

#### 4. Statements made contrary to Rule 608(a).

■ CMIC also contends that paragraph 30 of each Plaintiff's supplemental affidavit improperly represents inadmissible character evidence per Rule 608(a). [Docket No. 154 at p. 9.] In paragraph 30 of these affidavits, each Plaintiff represented: "I enjoyed a strong, solid reputation for honesty and integrity with my subproducer (sic) base." CMIC asserts that this evidence is inadmissible under Rule 608(a) because it introduces character evidence in the absence of any attack on Plaintiffs' reputation for truthfulness. [Docket No. 154 at p. 9.]

Plaintiffs counter that their "observations concerning a loss of credibility with their subproducers is not the same thing as evidence of one's general reputation for truthfulness in the community." [Docket No. 155 at p. 13.] The Court agrees that Plaintiffs' statements regarding their perceived reputation with their subproducer base are distinct from evidence attacking or supporting the credibility of a witness addressed in Rule 608(a). Moreover, Plaintiffs presumably do not offer this evidence to attack or support credibility in these proceedings. Thus, the Court overrules CMIC's objection to paragraph 30.

#### 5. Facts not in evidence.

CMIC challenges paragraph 6 of Plaintiffs' affidavits, which states: "I did not know that in 2000, Conseco, Inc. ('Conseco') and Gary Wendt made a decision to end the major medical business" on the basis that it assumes facts not in evidence. [Docket No. 154 at p. 7.] CMIC maintains that a 2000 plan to end the major medical business is an assumed fact because, according to CMIC, in 2000 the only plan that existed was to sell Conseco Medical. [*Id.*] The Court is not convinced that there is a principled distinction between "sell" and "end." Plaintiffs have proffered their evidence and CMIC is free to contest that evidence with admissible evidence of its own. That a particular fact is disputed is not a sufficient basis to strike a party's evidence. Thus, the Court overrules CMIC's objection to paragraph 6.

### III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ill. Cent. R. Co. v. So. Tec Development Warehouse, Inc.,* 337 F.3d 813, 816 (7th Cir.2003). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Fritcher v. Health Care Service Corp.,* 301 F.3d 811, 815 (7th Cir.2002), quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *Magin v. Monsanto Co.,* 420 F.3d 679, 686 (7th Cir.2005).

## IV. Background.[10]

### A. Key players.

From the late 1990s throughout 2002, Conseco, Inc. owned CMIC. Plaintiffs—4 individuals and 6 businesses—marketed insurance products for CMIC as field marketing organizations ("FMOs"). Plaintiffs recruited independent agents, also known as subproducers, to sell insurance policies issued by CMIC among other insurance carriers. The subproducers who sold policies issued by CMIC contracted directly with CMIC. [Steve Smith Dep. at p. 54.] When Plaintiffs signed on with CMIC, they brought 95 percent of their subproducers with them. [Pls.' Supp. Aff. ¶¶ 30–31.] Plaintiffs' credibility with these subproducers was critical to Plaintiffs' success. [Jon Eastman Dep. at p. 135.]

The primary contact between the FMOs and CMIC was Jon Eastman, Conseco, Inc.'s senior vice president. [Eastman Dep. at p. 20.] From June 1999 through mid 2000, Ed Berube was Conseco, Inc.'s president. [Berube Dep. at pp. 19–20.] Gary Wendt replaced Berube in July 2000. [*Id.* at p. 22.] In 2001, Timothy O'Keefe was president of Conseco, Inc.'s major medical division, and Byron Hopma was its regional vice president of sales.

### B. Plaintiffs' relationship with CMIC.

Plaintiffs and CMIC enjoyed mutual trust and confidence in each other. [O'Keefe Dep. II at p. 140; Hopma Dep. at p. 70.] CMIC regarded Plaintiffs as a "second family," [Hopma Dep. at p. 69; Eastman Dep. at p. 58] and CMIC referred to FMOs such as the Plaintiffs as "marketing partners" [O'Keefe Dep. I at pp. 192–93]. Moreover, CMIC shared with Plaintiffs confidential information and privileged strategic plans at CMIC's August 2000 annual FMO sales conference. [CMIC Field Focus, Vol. 13, No. 5, September/October 2000.] CMIC invited FMOs "into the very heart of the organization." [*Id.* at p. 1.] CMIC further acknowledged that due to the "partnership" between CMIC and its FMOs, the "FMO needs to know what we know." [*Id.*]

Sales representative agreements governed the Plaintiffs' relationship with CMIC. Pursuant to these agreements, Plaintiffs marketed CMIC's products and, in turn, received commissions. The sales representative agreements authorized CMIC to withdraw its policies from any market at any time. Included in the Plaintiffs' sales representative agreements was a standard termination provision, which provided that "[e]ither party may terminate this Agreement by giving written notice to the other party at least 30 days prior to such termination date." Pursuant to the agreements, Plaintiffs acted as the home office contact for subproducers and performed tasks typically left to an insurer's home office. [O'Keefe Dep. pp. 181–83; October 2000 UBS Warburg Memorandum.][11] CMIC dictated many aspects

**10.** The facts are either undisputed or viewed in a light most favorable to the Plaintiffs, the non-moving parties. In addition, this background section is a brief overview of the facts, not an exhaustive recitation of all material facts.

**11.** Plaintiffs filed the UBS Warburg memorandum under seal as part of its designated evidence in opposition to summary judgment, in pertinent part, as exhibits 35 and 75. [See Docket No. 145.] Because part of this evidence is germane to the dispute that the Court must publicly decide, and any basis for secrecy appears dubious, the Court is inclined to unseal this evidence. *See Hicklin Engineering v. R.J. Bartell*, 439 F.3d 346, 348 (7th Cir.2006) ("What happens in federal court is presumptively open to public scrutiny."). Within 10 days of this entry, the Court will unseal this evidence unless any party can establish good cause for why this evidence should remain sealed.

of the Plaintiffs' marketing efforts. [Pls.' Aff. ¶¶ 7, 8, 15.]

CMIC presented Plaintiffs with an addendum to the sales representative agreements in 1999, 2000, and 2001. This addendum was known as the Field Marketing Organization ("FMO") guidelines.[12] The Plaintiffs signed yearly FMO guidelines in order to retain their exclusive FMO status with CMIC. [Hopma Dep. at p. 109.] As a result, the Plaintiffs earned the highest level of commissions from CMIC and were also eligible for industry leading bonuses. In exchange for receiving the top contract with CMIC, Plaintiffs agreed to give CMIC a right of first refusal on their major medical business, as expressed in the FMO guidelines. The right of first refusal required Plaintiffs to provide CMIC the first opportunity to accept new medical applications generated from Plaintiffs' primary marketing area, and Plaintiffs could only offer the application to other insurers if CMIC declined to insure the applicant. The FMO guidelines did not affect the applicability of the sales representative agreements, including CMIC's ability to withdraw from any market and terminate the relationship with thirty days' notice.

CMIC's relationship with Plaintiffs was independent from its relationships with policyholders. CMIC contracted with each policyholder, and Plaintiffs had no contractual agreement with those policyholders. [Smith Dep. at pp. 54–55.] Further, CMIC entered into a sales representative agreement with subproducers who sold or marketed its products, including each agent in the down-line of any particular FMO. [*Id.*] Plaintiffs were not a party to those particular contracts. [*Id.*]

## C. CMIC's actions and representations concerning the major medical business.

Conseco, Inc. retained UBS Warburg[13] in the fall of 2000 to help facilitate the sale of Conseco, Inc.'s individual major medical insurance business, which included CMIC. [O'Keefe Dep. I at pp. 269–70.] CMIC notified the FMOs that CMIC was for sale. Some Plaintiffs were aware as early as the latter part of 2000 that CMIC was for sale. [Jasnoski Dep. at p. 170; Schwenkner Dep. at pp. 75–76, 104; Smith Dep. at pp. 131–32.] In fact, at the August 2000 annual FMO sales conference, "extraordinary communication and candor ... flowed between [CMIC] employees and FMOs" and CMIC divulged that "loss ratios were higher than expected ... that some blocks of business had performed very poorly indeed ... and that expenses were greater than they should be." [CMIC Field Focus, Vol. 13, No. 5, September/October 2000.]

Further, Conseco, Inc. stated multiple times in its SEC quarterly report for the period ending September 30, 2000 that it intended to sell its individual major medical line of business. [9/30/00 Quarterly Report, p. 7.] Similar statements are contained in Conseco, Inc.'s 2000 SEC annual report. [2000 Annual Report.] Byron Hopma, CMIC's vice president of sales, described the intended sale as "business as usual" with respect to the Plaintiffs.

---

12. These addendums were titled in various ways from year to year. For instance, Plaintiffs 1999 and 2000 FMO guidelines are entitled "Field Marketing Organization Guidelines." Plaintiffs' 2001 FMO guidelines are entitled "Field Marketing Organization Marketing Partnership Guidelines." This "partnership" referred to the marketing relationship between CMIC and the FMOs. [Brophy Dep. at p. 205.] For ease of reference the Court will refer to these addendums as the FMO guidelines.

13. UBS Warburg is a global financial firm which, as a part of its business, facilitates mergers and acquisitions.

[Hopma Dep. at pp. 72–73.] Conseco, Inc. highlighted the virtues of retaining the FMO field force during its discussions with prospective buyers. [O'Keefe Dep. I at pp. 225–26; Brophy Dep. at pp. 78–79, 159, 210–11.] In October 2000, CMIC was "rapidly expanding" its FMO system. [October 2000 UBS Warburg Memorandum.]

Between 2000–02, CMIC executives told Plaintiffs verbally and in writing that CMIC was financially stable, profitable, and firmly committed to remaining in the major medical market. For instance, in May 2000, Ed Berube wrote Plaintiffs a letter in response to their concerns and represented that CMIC was "viable," "healthy," and "strong." [Berube Dep. at pp. 92–93.] Berube wrote this letter for the purpose of allaying any concerns Plaintiffs may have had concerning CMIC. [Id. at pp. 89–90, 96.] In June 2000, Conseco, Inc. claimed its "insurance subsidiaries continue to be financially strong and well capitalized." [June 15, 2000, CMIC press release.] In a June 16, 2000 letter to the FMOs, including Plaintiffs, Eastman wrote among other things that "[CMIC] enjoys a very strong financial position" and that "[CMIC] is financially strong and solvent. . . ." Similar representations were made consistently throughout 2001 and up to the final non-renewal in February 2002. [February 8, 2001 Eastman letter; Pls.' Aff. ¶ 23; Pls.' Supp. Aff. ¶¶ 5, 12, 23; FastFocus, Vol. 1, No. 8, July 27, 2001.]

What CMIC did not tell the Plaintiffs is that Conseco, Inc. CEO Gary Wendt, as early as August 2000, had developed a "debt reduction plan" that entailed grouping assets in a "box" to be sold or "rundown." [O'Keefe Dep. at pp. 241–42; August 5, 2000 Letter from Gary Wendt to Thomas Biagi and Jeffrey Sell; Conseco, Inc. December 19, 2000 Investor Briefing Overview.] CMIC was among the assets in the box. [Id.] This plan remained in

place throughout 2001. [February 26, 2001 Bank Presentation.]

CMIC also did not directly disclose that CMIC incurred the following annual losses respectively from 1999–2001: $ 22.5 million, $ 55 million, and $ 61 million. [Pls.' Supp. Aff. ¶ 23; O'Keefe Dep. I, pp. 171, 174, 177–79, 314.] Berube knew that CMIC was losing money throughout 2000. [Berube Dep. at p. 53.] Gary Wendt acknowledged that between July 2000, when he was hired, through 2002, the major medical block was generally unprofitable. [Wendt Dep. at p. 42.] In 2001, the individual major medical block of business was losing approximately $ 4–5 million per month. [Inanilan Dep. at pp. 82–83.]

Ultimately in July 2001, a decision was made to non-renew a portion of CMIC's block of business in 16 selected states because no viable purchaser or rewrite carrier was found. The decision to non-renew in the 16 selected states was made on July 15 or 16 and was communicated to the FMOs on July 25. [Brophy Dep. at pp. 111, 232.] CMIC released this information simultaneously to the Plaintiffs' subproducers and two days before it released it to policyholders. [Pls.' Supp. Aff. ¶ 24.]

In the fall of 2001, Conseco, Inc. hired Ali Inanilan as a consultant to examine the medical block to identify and make a recommendation on the best available options, which he summarized as selling, turning around, or shutting off the business. [Inanilan Dep. at pp. 46, 129.] Conseco, Inc. also asked Inanilan to reduce expenses as much as possible. [Id. at 38–39.] CMIC continued to pursue the sale of the remainder of the medical business block. [Id. at 46.] In the latter part of 2001 and early 2002, CMIC discussed the sale of the remaining block with Sun Capital, AMS, Fortis, Ceres, National Health, and Blue Cross and Blue Shield organizations. [Id. at 68; Brophy Dep. at pp. 145–46.]

Though the block of business improved somewhat after the first non-renew, the business continued to lose millions of dollars per month. [Inanilan Dep. at pp. 83–84.] In early February 2002, Inanilan ultimately concluded that non-renewal was the best viable option for Conseco, Inc., and he made a recommendation that it not renew the remainder block of business. [*Id.* at p. 85.] Conseco, Inc. followed his recommendation and decided not to renew the remainder of the block. [Brophy Dep. at p. 237.] Brophy issued a memorandum dated February 5, 2002 to all FMOs concerning Conseco, Inc.'s decision to non-renew the remaining individual major medical business. [*Id.*]

## V. Discussion.

### A. Breach of fiduciary duty.

The legal terrain defining breach of fiduciary duty remains substantively unchanged since the Court's disposition of CMIC's first motion for summary judgment.[14] Thus, there is no need to replow this ground. Instead, the Court moves directly to CMIC's claimed basis for summary judgment.

■■■ CMIC contends that no heightened relationship existed between it and Plaintiffs. Rather, it characterizes the nature of this relationship as "arm's length bargaining parties." [Docket Nos. 135 at p. 26; 150 at p. 13.] CMIC is correct that in Indiana, "[a] fiduciary relationship may not be premised on an arms length transaction resulting in the formation of a contract." *American United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 701 (Ind.Ct.App. 2004). Nevertheless, the Court is not convinced that the nature of this relationship

was only an arm's length contractual relationship. In this case, CMIC publicized a much closer relationship. The undisputed facts show that CMIC held Plaintiffs close by divulging certain confidential information and privileged strategic plans. Plaintiffs were the home office contact for subproducers and performed tasks typically left to an insurer's home office. CMIC dictated many aspects of the Plaintiffs' marketing efforts. In fact, CMIC's and Plaintiffs' relationship was so intertwined that CMIC pitched its FMO structure as a selling feature to prospective buyers. Based on the factual record developed here, a reasonable jury could conclude that CMIC and Plaintiffs shared more than the arm's length contractual relationship urged by CMIC. Thus, as the Court noted in its August 26, 2005 entry, whether the parties' relationship can be characterized as one of agency is key to the disposition of CMIC's motion on this claim. [See Docket No. 64 at pp. 12–15.]

■■■ In Indiana "[w]hen one person gives another person authority to act on his behalf, an agency relationship is created." *Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind.Ct.App.1997). "To establish an agency relationship three elements must be shown: (1) a manifestation of consent by the principal to the agent, (2) an acceptance of the authority by the agent, and (3) control exerted by the principal over the agent." *Id.* The record here, when construed in a light most favorable to the Plaintiffs, actually bolsters those facts that precluded CMIC's first summary judgment. Namely, the facts reveal that CMIC authorized the Plaintiffs to sell CMIC's policies. Pursuant to their

14. CMIC asserts that *Coca–Cola Co. v. Babyback's International, Inc.*, 806 N.E.2d 37, 46 (Ind.Ct.App.2004), is no longer good law as it pertains to Plaintiffs' breach of fiduciary duty claim. While it is true that the Indiana Supreme Court vacated in part this decision, nothing in the Supreme Court's decision altered the legal contours of a breach of fiduciary duty claim. *See Coca–Cola Co. v. Babyback's International, Inc.*, 841 N.E.2d 557 (Ind.2006).

agreement, Plaintiffs actively promoted, advertised and recruited sales representatives on behalf of CMIC using established company guidelines. In addition, CMIC required the Plaintiffs to exclusively sell CMIC's products, and CMIC maintained the right of first refusal on all individual major medical business within the Plaintiffs' primary marketing areas. Given these facts, a jury could reasonably conclude that the Plaintiffs were CMIC's agents, and CMIC's arguments in this regard fare no better than they did initially.

Moreover, the facts most favorable to Plaintiffs show that CMIC misrepresented its financial stability and led the Plaintiffs to believe that it was committed to the major medical insurance market to prevent the Plaintiffs from selling insurance offered by other providers. Consequently, whether CMIC breached its fiduciary duty to Plaintiffs remains a triable issue of fact,[15] and the Court denies CMIC's summary judgment motion concerning Count II (breach of fiduciary duty) of Plaintiffs' amended complaint.

## B. Plaintiffs' fraud claims.

In its entry on CMIC's first motion for summary judgment, this Court recognized that in order for Plaintiffs to overcome summary judgment on their tortious interference claim, CMIC must have acted illegally—and fraud is a sufficient illegal act—in its interference with Plaintiffs' business relationships. [Docket No. 64 at p. 18.] Accordingly, the Court will assess the viability of Plaintiffs' fraud claims first.

### 1. Actual fraud, fraudulent inducement, and deceit.

In Indiana, the essential elements of actual fraud and fraudulent inducement are the same. *Siegel v. Williams,* 818 N.E.2d 510, 515 (Ind.Ct. App.2004). To defeat CMIC's summary judgment motion on these claims, the Plaintiffs must raise a material issue of fact concerning: (1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; and (3) which caused the Plaintiffs to rely upon the misrepresentation to the Plaintiffs' detriment. *Id.* Liability under a theory of deceit arises where the actual fraud is intentional. *Shepherd v. Truex,* 823 N.E.2d 320, 327–28 (Ind.Ct. App.2005).

"Past or existing facts" means those facts which at the time they are uttered "are susceptible to 'exact knowledge.'" *Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1411 (7th Cir.1986) (*internal citation omitted*). This definition includes unqualified guarantees. *Id.* It excludes statements of opinion, intent, or promises of future conduct. *Biberstine v. New York Blower Co.,* 625 N.E.2d 1308, 1315 (Ind.Ct.App.1993); *see also Peoples Trust Bank v. Braun,* 443 N.E.2d 875, 878–79 (Ind.Ct.App.1983), *citing Sachs v. Blewett,* 206 Ind. 151, 185 N.E. 856 (1933). "Actual fraud may not be predicated upon representations of future conduct." *Siegel,* 818 N.E.2d at 515. Nor can it be "predicated upon acts which by law a party has a right by law to do," or "upon the nonperformance of acts which by law [a party] is not bound to do." *Maynard v. 84*

---

**15.** Plaintiffs' relative knowledge regarding the insurance industry is of little consequence to this issue despite CMIC's contentions to the contrary [see Docket No. 135] because Plaintiffs' claim is not premised on CMIC's decision to exert its contractual right to non-renew in February 2002. Rather, Plaintiffs' claim of breach of fiduciary duty is triggered by CMIC's representations of financial stability and commitment to the medical block of business.

*Lumber Co.*, 657 N.E.2d 406, 409 (Ind.Ct. App.1995).

Plaintiffs contend that CMIC made two material misrepresentations of fact that constitute fraud, deceit, and fraudulent inducement. They contend that CMIC intentionally and falsely communicated to them that it was "committed" to the medical business block and that it was profitable during 2000 and 2001. [Docket No. 147 at pp. 38–46.] CMIC argues that it made no misrepresentations and alternatively, that Plaintiffs' reliance on its statements was unreasonable. [Docket No. 150 at p. 7.]

■■■ CMIC's focus on its decisions to sell and initial decision to non-renew in 16 states does not further its cause. Had these truly been Plaintiffs' claims of misrepresentation, the Court's work would be simple. Instead, the Plaintiffs' hone in on CMIC's characterization of its intended sale as it relates to its commitment to the major medical block, and its affirmations of profitability. The record before the Court when viewed in a light most favorable to Plaintiffs is that CMIC repeatedly and emphatically stated it was profitable during periods of time it actually knew it was hemorrhaging millions of dollars. CMIC further represented that it was being sold as a way of managing the company toward continuing profitability when in fact, Conseco, Inc. President Gary Wendt intentionally and knowingly grouped CMIC in a box of assets to be disposed of for the purposes of overall debt reduction. CMIC withheld these facts from the Plaintiffs prior to any of its decisions to non-renew. CMIC's disclosed representations are irreconcilable with the facts that were available to CMIC from 2000 throughout early 2002. On this record, triable issues of fact remain concerning whether CMIC knowingly and intentionally failed to disclose certain facts to these Plaintiffs.

CMIC next contends that Plaintiffs' reliance was unreasonable cannot resurrect its summary judgment motion. CMIC argues that Plaintiffs' reliance was unreasonable primarily because the parties were bound by contract language, the alleged misrepresentations were contrary to known industry standards, and information concerning Conseco, Inc.'s financial health was publicly disclosed. [Docket No. 135 at pp. 27–35.]

CMIC's position is not persuasive. It is true that a party complaining of fraud— actual or constructive—"must have had a reasonable right to rely upon the statements made or omitted." *Westfield Ins. Co. v. Yaste, Zent & Rye Agency*, 806 N.E.2d 25, 31 (Ind.Ct.App.2004). However, the reasonableness of a party's reliance generally becomes a question of fact where the record evidence is susceptible, as it is in this case, to more than one interpretation. *Ruff v. Charter Behavioral Health Sys. of N.W. Ind. Inc.*, 699 N.E.2d 1171, 1175 (Ind.Ct.App.1998).

CMIC's reasonableness arguments are untenable on two fronts. First, the contract language does not divest Plaintiffs of their entitlement to known, accurate factual information from CMIC. The right to terminate the agreements between Plaintiffs and CMIC with 30 days' notice does not render Plaintiffs' reliance on CMIC's representations concerning commitment and profitability unreasonable. Such an argument is counterintuitive. Plaintiffs' contention is that had they known that CMIC was being sacrificed as a debt reduction asset by Conseco, Inc., and/or that CMIC was losing millions of dollars a year, they would not have re-signed exclusive agreements with CMIC in 2000 or 2001. Thus, the 30 day notice provision lacks any impact on the overall analysis of Plaintiffs' claims at this juncture.[16]

---

**16.** This is not to say that such evidence lacks any probative punch in this case. Such con-

tractual provisions may ultimately limit the

Moreover, questions of accountability with industry standards and the availability of alternate and indirect sources of public information regarding CMIC or Conseco, Inc.'s financial health are not dispositive of whether Plaintiffs reasonably relied on CMIC and Conseco, Inc.'s directly related information. At most, such evidence merely gives rise to triable issues of fact concerning the reasonableness of Plaintiffs' reliance. As a result, CMIC's summary judgment motion as it relates to Plaintiffs' amended complaint Counts IV (fraud and deceit) and VII (fraudulent inducement) is denied.

## 2. Constructive fraud and fraudulent concealment.

■■■■ To thwart CMIC's summary judgment motion regarding Plaintiffs' constructive fraud claim, Plaintiffs must raise a triable issue of fact that: (1) by virtue of the relationship between CMIC and the Plaintiffs, a duty existed; (2) CMIC made representations or omissions in violation of its duty to Plaintiffs; (3) Plaintiffs relied on those representations or omissions; (4) Plaintiffs were injured as a proximate result; and (5) CMIC gained an advantage at Plaintiffs' expense. *Siegel,* 818 N.E.2d at 516; *American United Life Ins. Co. v. Douglas,* 808 N.E.2d 690 (Ind.Ct.App. 2004). "Pure contractual relations between parties entering into an arm's length transaction may not form the basis of constructive fraud . . . ." *Comfax Corp. v. North American Van Lines,* 587 N.E.2d 118, 126 (Ind.Ct.App.1992). Nonetheless, "the failure to disclose all material facts by one on whom the law imposes a duty to disclose constitutes actionable fraud." *Fimbel v. DeClark,* 695 N.E.2d 125, 127 (Ind.Ct.App.1998) (*internal citation omitted*). For instance, "[w]hen a buyer makes inquiries about the qualities of" the subject of sale, such a duty conferring damages available to Plaintiffs should they

relationship exists and the seller must "fully disclose all problems with the subject of the inquiry." *Id.*

■■■ Fraudulent concealment claims significantly overlap constructive fraud claims. To survive CMIC's summary judgment motion concerning fraudulent concealment, Plaintiffs must raise a triable issue of fact that: (1) CMIC had a duty to disclose certain facts to Plaintiffs; (2) it knowingly failed to do so; and (3) Plaintiffs justifiably relied on such non-disclosure to its detriment. *De Voe Chevrolet–Cadillac, Inc. v. Cartwright,* 526 N.E.2d 1237, 1240 (Ind.Ct.App.1988).

■■■ Plaintiffs can show that a duty existed by two means. "Generally, the plaintiff must prove a fiduciary or fiduciary-like relationship to establish constructive fraud." *Cash in a Flash, Inc. v. McCullough,* 853 N.E.2d 533, 538 (Ind.Ct. App.2006). In the absence of such a relationship, principles of Indiana common law may give rise to a sufficient duty. *Am. United Life Ins. Co.,* 808 N.E.2d at 695–96. In this instance, the Court has already found that Plaintiffs have produced sufficient evidence to raise a genuine issue of fact regarding a fiduciary relationship between the parties. Accordingly, a genuine issue of fact exists whether CMIC owed Plaintiffs a duty to disclose the facts Plaintiffs allege it omitted throughout 2000 and 2001.

■■■ CMIC relies on several cases from other state courts for the proposition that the binding contract between Plaintiffs and CMIC foreclosed Plaintiffs' fraud and fiduciary duty claims by negating any duty that might have otherwise existed. None of these cases assess claims with sufficiently similar facts to this case to be of any value to this Court. Most notably, none of these courts identified a triable issue of

prevail at trial.

fact concerning agency. *See, e.g., Dodd Ins. Services, Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1157 (10th Cir.1991) ("Plaintiffs did not undertake to act for the benefit of Royal. Nor did the business relationship between the parties cause plaintiffs to relax the care and vigilance [they] would and should have ordinarily exercised in dealing with a stranger.") (*internal citation omitted*). In each of CMIC's cited cases, the court determined that the parties were no closer than the contracts between them and thus, no duty arose. Further, none of these cases involved extensive misrepresentations of profitability similar to those CMIC allegedly made prior to its announcement of withdrawal in 2002. Consequently, these holdings are readily distinguishable, nonbinding, and thus have no import on the outcome of this case.

With respect to the two remaining prongs, CMIC's arguments suffer the same fate as did CMIC's arguments concerning actual fraud, fraudulent inducement and deceit. The record as detailed above, when construed in a light most favorable to Plaintiffs, raises genuine triable issues of fact best left to a jury. Therefore, the Court denies CMIC's summary judgment motion regarding Plaintiffs' amended complaint Counts V (constructive fraud) and VI (fraudulent concealment).

## C. Tortious interference.

■ As seen above, Plaintiffs have raised the requisite genuine issue of fact regarding illegal conduct. Nevertheless, this claim still succumbs to CMIC's summary judgment motion. This is because Plaintiffs cannot overcome the remaining obstacle posed by CMIC's status in the relevant contracts. An action for tortious interference "involves the intervention of a third party. . . ." *Keith v. Mendus*, 661 N.E.2d 26, 36 (Ind.Ct.App.1996), *citing Martin v. Platt*, 179 Ind.App. 688, 386

N.E.2d 1026, 1027 (1979) (holding that officers of a corporation acting within the scope of their employment could not be held independently personally liable for inducing the corporation's breach of its contract). CMIC was a party to the contracts between itself and Plaintiffs. As part and parcel of its relationship with Plaintiffs, CMIC contracted with each of Plaintiffs' subproducers. Thus, the requisite intervention by a non-party to the integral relationship is lacking. *See Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind.Ct.App.2000) (essential elements of a tortious interference claim are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship").

Plaintiffs contend that this claim should survive summary judgment because they have demonstrated a business relationship with their subproducers beyond any that includes CMIC. [Docket No. 147 at pp. 63–64.] The Court disagrees. Even viewing the summary judgment record in Plaintiffs' favor, the evidence does not suggest that CMIC interfered with any extraneous business relationship separate from any relationship involving CMIC. Yet, even if the Court were so persuaded, Plaintiffs' tortious interference claim still cannot withstand summary judgment. This is because CMIC was justified in taking the actions—non-renewal and termination of contracts under its agreements with Plaintiffs and the subproducers—that Plaintiffs claim tortiously interfered with their business relationship. Thus, Plaintiffs cannot raise a triable issue of fact under this theory of liability, and the Court grants CMIC's summary judgment motion on Plaintiffs' amended complaint Count III (tortious interference).

#### D. Promissory Estoppel.

CMIC contends that the valid sales representative agreements between the parties is a fatal flaw to Plaintiffs' promissory estoppel claim. Generally, promissory estoppel requires: (1) a promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise. *Citizens Financial Services, FSB v. Innsbrook Country Club, Inc.*, 833 N.E.2d 1045, 1056 (Ind.Ct.App.2005). However, under Indiana law, promissory estoppel cannot give rise to a cause of action where a written contract controls the very promise upon which the claim is premised. *Meisenhelder v. Zipp Exp., Inc.* 788 N.E.2d 924, 932 (Ind.Ct.App.2003). In this case, the only promises CMIC made to Plaintiffs are found in its sales representative agreements and the addendums to those, which the Court previously found controlled their respective business relationship.[17] [See Docket No. 64.]

Plaintiffs have not proffered any evidence that would alter the Court's previous conclusion that a valid contract existed between the parties. Thus, promissory estoppel is not a viable theory of liability due to the existence of these valid written contracts between the parties, and there is no need to further analyze the essential elements of Plaintiffs' claim. Accordingly, the Court grants summary judgment in CMIC's favor on Plaintiffs' amended complaint Count VIII (promissory estoppel).

17. Plaintiffs try to frame this claim against the backdrop of CMIC's statements of profitability and commitment to the major medical block but fail to proffer any evidence that CMIC made such promises. In fact, with respect to their fraud claims Plaintiffs contend—and the Court found herein—that these were present representations as opposed to promises that would likely have negated Plaintiffs' fraud claims.

#### VI. Conclusion.

For the reasons stated above, the parties' evidentiary challenges are overruled. CMIC's second motion for summary judgment [Docket. No. 113] is granted in part and denied in part. CMIC's motion is granted with respect to Count III (tortious interference) and Count VIII (promissory estoppel) of Plaintiffs' second amended complaint. Summary judgment is denied with respect to Count II (breach of fiduciary duty), Count IV (fraud and deceit), Count V (constructive fraud), Count VI (fraudulent concealment), and Count VII (fraudulent inducement).

This case remains set for a final pretrial conference on **April 27, 2007** and for trial by jury on **May 9, 2007**. Absent settlement, counsel shall comply with the CMP provisions for pretrial filings and expect to try this case as scheduled.